CHR. BJELLAND & CO., INC. v. UNITED STATES (No. 5164)*

United States Court of Customs and Patent Appeals, April 22, 1965

*Sharretts, Paley & Carter* (*Howard Clare Carter,* of counsel) for appellant.
*John W. Douglas,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section, *Charles P. Deem* for the United States.

*C.A.D. 855.

[Oral argument November 2, 1964, by Mr. Carter and Mr. Deem]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges

MARTIN, Judge, delivered the opinion of the court:

██ Chr. Bjelland & Co., Inc. (hereinafter Bjelland) appeals from a decision of the United States Customs Court, Second Division, Appellate Term (A.R.D. 161), affirming the judgment of the trial court wherein the statutory export value of certain items of merchandise, brisling sardines in olive oil and kipper snacks, was held to be the appraised value rather than the importer's claimed value.

The appraised value of the merchandise was determined to be the actual selling price under the provisions of section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, Public Law 927 (70 Stat. 943), T.D. 54165, since the merchandise in question was not specified in the final list, T.D. 54521, published by the Secretary of the Treasury, pursuant to section 6(a) of said Public Law 927.

Section 402(b), Tariff Act of 1930, as amended, defines export value as follows:

(b) EXPORT VALUE.—For the purposes of this section, *the export value* of imported merchandise *shall be the price*, at the time of exportation to the United States of the merchandise undergoing appraisement, *at which such or similar merchandise is freely sold* or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and *in the ordinary course of trade*, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States. [Emphasis supplied.]

We shall refer below to the definition sections of the Act in our analysis of the above emphasized phrases in section 402(b) which must be considered in the determination of export value where the merchandise is not specified in a section 6(a) list.

Appellant is the wholly owned subsidiary of the packer and exporter, Chr. Bjelland & Co. A/S (hereinafter Bjelland A/S), of Stavanger, Norway. Appellant sells the imported merchandise under the well-known "King Oscar" brand. Bjelland A/S limited its exportation to the United States during the period in question, 1957, 1958 and the first half of 1959, to two purchasers, appellant and P. V. Bright & Co., Chicago, Illinois (hereinatfer Bright). Bright purchased at the same price and terms as appellant, but was territorially limited to fourteen mid-western states, while appellant was limited to the remaining states and the District of Columbia.

At the trial in the instant case, the record in *Chr. Bjelland & Co.* v. *United States*, 45 Cust. Ct. 435, Reap. Dec. 9753, was incorporated into the present record in order to show the conditions and practices under

which the exporter did business with the two United States purchasers.   That decision summarized an affidavit of Chr. W. Bjelland, president of Bjelland A/S, as follows:

(1) The two purchasers were not permitted to purchase sardines or kippered herring from any other packer than the exporter.

(2) They were required to defray some or all of the costs for advertising the exporter's products in the United States, the minimum amounts to be spent and the percentage of the costs to be borne by each purchaser to be determined solely by the exporter.

(3) They were required to pay for the goods at the time of shipment.

(4) They were required to maintain warehouse facilities at various places, so as to be able to make spot deliveries when required.

(5) They were required to guarantee their customers' floor stocks against price decreases, without reimbursement from the exporter.

(6) They were required to furnish product liability insurance.

(7) They were required to assume full responsibility for replacement or make allowances for "spoils" and "swells."

(8) The prices were determined solely by the exporter, were not subject to negotiation, and could be changed after the merchandise had been shipped.

(9) One of the purchasers was a wholly owned subsidiary as to the policies of which the exporter exercised absolute and complete control.   The other purchaser was required to advance at the beginning of the packing season as much capital as the exporter estimated it would require.

Appellant offered the affidavit of Olav Omland, "Secretary General of the Export Committee for Norwegian Canned Fish Products," who was familiar with export practices, particularly prices, payment terms, and advertising, to show the "ordinary" manner of doing business of other Norwegian canners.   The affidavit states that:

1)   Sales of canned fish are primarily made from Norwegian canning factories and exporters direct to importers in the U.S.A.—to a lesser extent through U.S. agents.

The general routine is that offers giving details of prices, payment and delivery terms are submitted to the U.S. buyers and must be accepted by them before a sale can be concluded.   It is not usual that the sales contract stipulates any conditions as regards the buyer's re-sale of the merchandise.   It is also extremely seldom that the seller makes any sale conditional of any obligation on the part of the buyer to confine his purchases of such merchandise to the seller, or to carry a minimum stock at any time.

2)   The usual Norwegian sales terms are Net FOB or CIF U.S. sea port.

3)   The usual payment terms are Cash Against Documents on arrival of the merchandise at American port.

4)   It is usual that the Norwegian seller gives a guarantee against decline in prices for a period of 30 days after arrival of the merchandise in U.S. port or to transit port if the ultimate destination is an interior distributing point.

5)   If the American buyer carries a Products Liability Insurance, it is customary that the Norwegian seller gives a 0.3% price refund to the buyer.

6)   Only few Norwegian canning factories and exporters have advertised their products in the U.S.A.   Such brand advertising is entirely at the Norwegian brand owners expense.

Appellant also called as witnesses Sigurd Sater, president and general manager of Trondhjem Preserving Co., New York, and who is also director of the Norwegian-American Chamber of Commerce of America, and Emanuel H. Jacobsohn of Granadaisa Foods, Inc., both importers of sardines and kipper snacks. Both testified that they purchased from at least five different Norwegian packers, none of which required that they purchase only from them. We adopt the trial court's summary of their other testimony as our own:

(1) Such packers sold their merchandise to others, in addition to the witnesses above named;

(2) None of such packers imposed any restrictions on the disposition or use of the Norwegian sardines and snacks so purchased;

(3) The merchandise sold by these packers was paid for on sight or after passing examination by the "Pure Food & Drug Department;"

(4) Such packers never required, as a condition of sale, payment for the goods at the time of shipment;

(5) The packers never required, as a condition of sale, that the purchasers maintain warehouse facilities at a particular place;

(6) These packers reimbursed the purchaser, if the price of sardines or kipper snacks was reduced within 30 days after arrival of the merchandise in the United States;

(7) The packers did not require the purchaser to furnish product liability insurance, it appearing that the witness Sater was reimbursed for product liability insurance which he purchased, while the witness Jacobsohn was not reimbursed for his purchase of such item;

(8) In the case of purchases made by the witness Sater, if there was a large quantity of spoiled or swelled cans, reimbursement has been made by the packer, whereas the purchaser Jacobsohn had a guarantee of 30 days from the date of shipment in such cases;

(9) The purchase price could not be increased after the merchandise had been shipped; and

(10) None of these packers had ever required the aforesaid purchasers to advance capital to the packer.

Appellee called as its witness Arthur G. Lange, connected with appellant Bjelland, who testified to appellant's share of the American market and the prices it paid for the goods. He stated that the average export from Norway of all canned fish, based on 50 pack, would probably be "in the neighborhood of 800,000 perhaps, 900,000" cases, and that on the various types of pack of brisling sardines Bjelland had a "fair" to "minor" share during 1957–1959 while "on the kipper snacks, we [appellant Bjelland] have a fair share of it, but we don't have as much as we do on brisling." As to quantities in terms of figures, he testified that "as a guess" Bright bought "over 25,000 cases" per year from Bjelland A/S while appellant bought over 100,000 cases of 50 pack in 1959 and somewhat less in 1957 and 1958. As to the relative price, he testified on redirect that "* * * On sild sardines and kipper snacks, generally we received [paid] the minimum or competing price. On brisling sardines, in those years we generally received [paid] the

higher price." He also stated that in the case of the merchandise before the court "we paid higher during 1957, 1958 and half of 1959."

Appellant contends that such evidence shows that the merchandise actually imported was not "freely sold" in the "ordinary course of trade" as required by section 402(b) of the Tariff Act of 1930, as amended, supra. Consequently, appellant contends, we must look to "such or similar merchandise" freely sold in the ordinary course of trade *by others* as defined in section 402(f) (4(B):

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

There is indication in the record that appellee agrees that 402(f) (4) (B) sales by others of such or similar merchandise, would be the proper alternative to the actual selling price as the export value of the merchandise.

Reference to the following definitions in the Simplification Act, 19 USC 1401a, section 402(f), will be necessary in the discussion to follow:

(f) DEFINITIONS.—For the purposes of this section—
(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.
(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

Appellant contends that the merchandise at bar was not "freely sold," since there were no sales to "selected purchasers" within the meaning of section 402(f) (1) (B), supra, but rather were sales to "captive purchasers" in which the element of free offers is not present. Appellant would have the test be whether the transactions were at arm's length and the sales at a price which fairly reflects the market value. Appellant argues that the purchasers have no freedom of negotiation and that the elements of a willing purchaser and seller are not present because of the controlled relationship between the parties. A price determined solely by the packer, appellant urges, cannot fairly reflect the market value of the merchandise. We do not agree with

appellant's contentions, but agree with the court below that the merchandise in question was "freely sold" within the meaning of section 402(f)(1)(B).

Section 402(f)(1)(B) defines "freely sold" as sold in the ordinary course of trade to one or more selected purchasers at a price which fairly reflects the market value of the merchandise without restrictions as to the disposition or use by the purchaser. By exception, certain restrictions are permitted, including those which "do not substantially affect the value of the merchandise to usual purchasers at wholesale." In the Hearings before the Committee on Ways and Means, House of Representatives, 84th Congress, first session, on the Customs Simplification Act of 1955 (now 1956), H.R. 6040, May 23 and 24, 1955, in a memorandum submitted to the Committee by the United States Tariff Commission, we find the following relevant comments on the term "freely sold":

(5) The appraiser may use actual sales instead of offers, where both exist, in determining export value or United States value.

(6) A definition of "freely sold or offered for sale" is provided for the first time. It will permit determination of an export value, United States value, or American selling price on the basis of sales or offers to wholesalers which are unrestricted, * * *. It will also permit the use of sales to exclusive agents and other restricted sales where such limitations do not affect the price. * * *

Appellant concedes that the merchandise was sold without restriction as to disposition or use except as to such disposition in a limited territory. Such exception to restrictions on disposition or use is permitted by section 402(f)(1)(ii). There is no evidence of restrictions on resale price, and the exclusive agent type of sale here cannot fairly be said to "substantially affect the value of the merchandise," section 402(f)(1)(iii). As the Customs Court recognized:

* * * The record herein establishes that King Oscar brand is a well-recognized, established product in the United States, which enables it to demand a higher price than some competitive products. The fact that a well-recognized brand can demand a higher price is not unique as to imports; it is fairly common in the domestic products of the United States, * * *.

This is a recognition that the market value is not merely the intrinsic value of the merchandise, but rather, is the price which a product is able to command in the market. The price may reflect the benefit to the purchaser of the goods that the goods are a well-recognized, established and advertised brand, without such benefit being an unfair indicia of market value.

Similarly we do not find that the instant "restrictions" "substantially affect the value of the merchandise" in the sense of the statute, section 402(f)(1)(iii). While appellant pays a premium, both in direct price and in services, the evidence indicates that appellant derives benefit, in terms of the value of the merchandise, from the exclusive dealership

agreement. The clearest example of a restriction which might affect the value to appellant, that of a fixed resale price, is concededly absent. Appellant has failed to point out in what way the instant method of dealing between the exporter and the wholly-owned American importer subsidiary represented a "restriction" which unreasonably or substantially affects the *value to appellant*. The statements in the Hearings, supra, at page 11, aid our interpretation of the statute:

\* \* \* As interpreted by the courts, our valuation laws [prior to the amendments to section 402] have failed to keep abreast of the developments of modern commerce. \* \* \* The definitions in clauses (1) and (2) of subsection (f) recognize accepted modern-day conditions and practices in commerce \* \* \*.

We think that the actual selling price as the basis of the assessed export value is a fair reflection of the market value in the circumstances herein, and is entirely consistent with that legislative intent. The Hearings, supra, at page 10, state:

\* \* \* Thus, the proposed new language [in section 402(b)] would not involve substantive changes in the valuation basis, but would merely make explicit in the statute that actual sales as well as offers for sale might be considered in determining dutiable value.

Consideration of actual sales is highly appropriate in the market situation before us.

Appellant also contends that the trade practices between Bjelland A/S and appellant are not in the "ordinary course of trade" as defined in section 402(f)(2) for use in sections 402(b) and 402(f)(1)(B).

To show the scope of this term appellant relies on *Chr. Bjelland & Co.* v. *United States*, Reap. Dec. 9753, supra, incorporated into the record in this case, wherein the trial judge stated, 45 Cust. Ct., at 442:

I am satisfied, therefore, that, in its application to the facts in the case at bar, the term "ordinary course of trade" refers to the trade in the sale of Norwegian canned fish products for exportation to the United States *generally*, and is not limited to the trade in the canned fish products of the seller of the merchandise at bar. [Emphasis supplied.]

In that case the phrase of section 402(f)(2) "normal in the trade \* \* \* with respect to merchandise of the *same class or kind* as the merchandise undergoing appraisement" [emphasis added] was interpreted in view of *Star-Kist Foods, Inc.* v. *United States*, 45 CCPA 16, C.A.D. 666, wherein the term "class or kind" was held to broaden the scope of the statutory language with which it was used. In the *Star-Kist* case, tuna in brine was held to be the same class or kind as tuna in oil within the meaning of the statute.

The scope of the term "ordinary course of trade," as it relates to the class or kind of merchandise, was narrowed somewhat in *Inter-Maritime Forwarding Co.* v. *United States*, 51 Cust Ct. 529, A.R.D. 162, which relied on *Chr. Bjelland & Co.* v. *United States*, Reap. Dec. 9753, *supra*, and stated as follows:

The term "ordinary course of trade" itself the subject of statutory definition has been construed in the light thereof as reflecting conditions and practices which are normal and usual in the trade involving the sale, in the country of exportation of *merchandise such as or similar to* the merchandise undergoing appraisement. [Emphasis supplied.]

Appellant argues that the correct interpretation of the phrase "ordinary course of trade" is the interpretation appearing in the Reap. Dec. 9753. However, the trial judge in the instant case, stated:

* * * While, apparently, these conditions are given so as to establish the ordinary course of trade between other Norwegian exporters of products such as here involved, they have no bearing on the transactions here *between the exporter in question and the purchaser in this case*, which transactions, in my opinion, *are in the ordinary course of trade as affecting the brand of merchandise sold by the exporter here under consideration.* * * * The "ordinary course of trade," under the statutory definition, would include the sales made by the Bjelland company as well as those made by the other exporters. [Emphasis supplied.]

Appellant contends that that statement of the trial judge was inconsistent with the interpretation in the Reap. Dec. 9753, supra, and in effect was a holding that the trade practices of the exporter, Bjelland A/S, established the ordinary course of trade.

While the scope of the term in Reap. Dec. 9753 is somewhat broader than in the *Inter-Maritime* case, supra, it is only broader with respect to the reference to the "class or kind" of merchandise to which the ordinary course of trade relates. However, it is our view that such a controversy fails to reach the issue before us. We are comparing the course of trade of others with that herein, with respect to brisling sardines and kipper snacks. Brisling sardines and kipper snacks are the only class or kind of merchandise the trade in which we must determine is or is not ordinary. We have no evidence beyond those two types of fish products; to base a decision on a class which includes all kinds or types of fish would be to import into the evidence facts which are just not present.

We agree with the Customs Court that:

* * * there may well be instances wherein there is more than one manner of doing business which would constitute the "ordinary course of trade." This is particularly so in an instance such as is involved herein, where the exporter is accountable for a substantial, if not major, portion of the sales to the United States of brisling sardines and kipper snacks. * * *

We do not think that the intent of the statutory provision, as indicated above by quotations taken from the Hearings, would be served by a refusal to recognize that segments of a particular industry may deal under different conditions. While an entire industry may normally do business in the same manner, a choice of a convenient manner of doing business at some variance with the others cannot exempt the parties from the force of section 402(b). This is particularly the case where, as the Customs Court correctly analyzed the evidence, the business of

appellant and the exporter represents a substantial portion of the industry sales in the kind of merchandise at bar, and thus represents a substantial manner of doing business. The evidence tends to substantiate that appellant is the largest single importer of the items at bar, and the trade conditions and provisions under which it has done so have existed for some time. Accordingly, we do not find that the manner of doing business here to be outside the "ordinary course of trade" or to require the export value to be based on actual sales or offers thereof by *others* in the industry. *United States* v. *Acme Steel Co.*, 51 CCPA 81, 87, C.A.D. 841.

Our analysis of the position of the parties, as compelled by the arguments presented, has paralleled that of the lower courts. We believe, however, that the result could have been ascertained without such extended discussion because the importer is wholly owned by the exporter. Those things which are the exporter's costs of doing business, in what appellant terms the ordinary course of trade, for example, the price guarantee, return of swells, payment for advertising, become, in the appellant's view, "restrictions" when paid for by it as the importer. But we do not view those restrictions as any more than costs of doing business which the parent company has for its convenience shifted to its completely controlled subsidiary. A mere difference in allocating overall business costs among the various parts of a business does not strike us as a good reason to ignore the basic aim of the statute, to properly tax the importation of goods into this country.

Finding no error in the analysis of the Customs Court, the judgment is *affirmed*.